UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ZEV OSTREICHER,

                              Plaintiff,

              v.

TRANSUNION, LLC, *et al.*,

                              Defendants.

No. 19-CV-8174 (KMK)

OPINION & ORDER

---

Appearances:

Kenneth Willard, Esq.
David P. Force, Esq.
Stein Saks PLLC
Hackensack, NJ
*Counsel for Plaintiff*

Arjun Rao, Esq.
Ali Fesharaki, Esq.
Stroock & Stroock & Lavan LLP
Los Angeles, CA
*Counsel for Defendant Discover Bank*

KENNETH M. KARAS, United States District Judge:

        Plaintiff Zev Ostreicher ("Plaintiff") brings this Action against Defendants TransUnion,

LLC ("TransUnion"); Discover Bank ("Discover," or "Moving Defendant"); Bank of America,

N.A. ("Bank of America"); and TBF Financial, LLC ("TBF"; collectively, "Defendants"),

claiming violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*  (*See*

*generally* Am. Compl. (Dkt. No. 62).)[1]  Before the Court is Moving Defendant's Motion To

---

        [1] Plaintiff also originally brought suit against American Express Company ("American
Express") and Equifax Information Services, LLC ("Equifax").  (*See generally* Compl. (Dkt. No.
1); Am. Compl.)  However, on November 11, 2019, Plaintiff notified the Court that he had
reached a settlement with American Express.  (Dkt. No. 27.)  The Court terminated American

Compel Arbitration and Stay this Action (the "Motion").  (*See* Moving Def.'s Not. of Mot. ("Not. of Mot.") (Dkt. No. 68).)

For the reasons explained herein, Moving Defendant's Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are taken from the Amended Complaint and the Declaration and exhibits submitted in connection with the Motion.  (Am. Compl.; Decl. of Janusz Wantuch in Supp. of Mot. ("Wantuch Decl.") (Dkt. No. 70).)[2]  The Court recounts only the facts that are relevant to the instant Motion.

#### 1.  The Parties

Plaintiff is a resident of New York State.  (Am. Compl. ¶ 4.)  Moving Defendant is a "federally-insured bank" that is chartered, incorporated, and has its principal place of business in Delaware.  (Wantuch Decl. ¶ 5.)  Moving Defendant issues the "'Discover Card' brand of revolving credit cards," including "Discover IT credit card[s]."  (*Id.*)

---

Express from the docket, (Dkt. No. 32), and Plaintiff filed a Notice of Voluntary Dismissal with Prejudice as to American Express on December 2, 2019, (Dkt. No. 46).

On February 21, 2020, Plaintiff and Equifax filed a Joint Stipulation of Dismissal, dismissing Equifax from the Action with prejudice.  (Dkt. No. 72.)  The Court signed this Stipulation on February 24, 2020.  (Dkt. No. 73.)

[2] "Courts deciding motions to compel [arbitration] apply a standard similar to that applicable for a motion for summary judgment."  *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (citation and quotation marks omitted).  Thus, the Court may "consider[] all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits."  *Id.* (citation, alterations, and quotation marks omitted); *see also Philippe v. Red Lobster Rests. LLC*, No. 15-CV-2080, 2015 WL 4617247, at *2 (S.D.N.Y. Aug. 3, 2015) ("It is . . . proper (and in fact necessary) to consider extrinsic evidence when faced with a motion to compel arbitration . . . ." (citation and quotation marks omitted)).

2.  The Cardmember Agreement and Revised Agreement

On December 16, 2015, Moving Defendant received Plaintiff's application for a "Discover IT credit card," (the "Card"), and Moving Defendant subsequently issued to Plaintiff a Discover IT credit card account (the "Account").  (*Id.* ¶ 6.)  Once Plaintiff's Account was opened, Moving Defendant mailed the Card and the applicable cardmember agreement (the "Cardmember Agreement") to the address that Plaintiff provided on his application.  (*Id.* ¶ 7.)  The Cardmember Agreement stated that Plaintiff would "accept th[e] Agreement if [he] d[id] not cancel [his] Account within 30 days after receiving a Card," and that Plaintiff would "also accept th[e] Agreement if [he] or an [a]uthorized [u]ser use[d] the Account."  (*Id.* ¶ 8; *id.* Ex. A ("Cardmember Agreement"), at 2 (Dkt. No. 70-1).)[3]  According to Moving Defendant, Plaintiff did not cancel his Account within 30 days of receiving the Card and also used the Account after receiving the Card.  (Wantuch Decl. ¶ 8.)  Moving Defendant represents that Plaintiff has never requested that the Account be cancelled.  (*Id.*)

The Cardmember Agreement also contained a provision titled "Agreement to [A]rbitrate," requiring that

> In the event of a dispute between [Plaintiff] and [Moving Defendant] arising under or relating to th[e] Account, either may choose to resolve the dispute by binding arbitration . . . instead of in court.  Any claim (except for a claim challenging the validity or enforceability of this arbitration agreement, including the Class Action Waiver) may be resolved by binding arbitration if either side requests it.  THIS MEANS IF EITHER [Plaintiff] OR [Moving Defendant] CHOOSE ARBITRATION, NEITHER PARTY SHALL HAVE THE RIGHT TO LITIGATE SUCH CLAIM IN COURT OR TO HAVE A JURY TRIAL.

---

[3] The Cardmember Agreement includes two different page numbers at the bottom of each page.  The Court therefore refers to the ECF-stamped page numbers at the top of each page to avoid confusion.

(Cardmember Agreement 4.)  The Cardmember Agreement specified that the agreement to arbitrate was governed by the Federal Arbitration Act ("FAA") and that the arbitration provision would survive "closing of [the] Account; voluntary payment of [the] Account or any part of it; any legal proceedings to collect money [Plaintiff] owe[s]; any bankruptcy by [Plaintiff]; and any sale by [Moving Defendant] of [the] Account."  (*Id.* at 4–5.)  The Cardmember Agreement allowed for rejection of the arbitration provision, so long as Plaintiff sent a written notice of rejection "within 30 days of [Plaintiff's] receipt of the Card after [the] Account [wa]s opened." (*Id.* at 5.)  Moving Defendant represents that Plaintiff did not send a notice of rejection. (Wantuch Decl. ¶ 8.)

The Cardmember Agreement also set forth that "[t]he rates, fees[,] and terms of th[e] Agreement may change from time to time," that Moving Defendant "may add or delete any term to th[e] Agreement," and that "[i]f required by law, . . . [Moving Defendant] w[ould] give [Plaintiff] advance written notice of the change(s) and a right to reject the change(s)." (Cardmember Agreement 2.)  Finally, the Cardmember Agreement included a section titled "Reporting to Credit Reporting Agencies," which stated that Moving Defendant "may from time to time review [Plaintiff's] credit . . . records" and "may report the status and payment history of [Plaintiff's] Account to credit reporting agencies and other creditors."  (*Id.* at 3.)  Moving Defendant represented that it "normally report[ed] to credit reporting agencies each month," and provided instructions on how to write to Moving Defendant if Plaintiff believed that information provided to credit reporting agencies was "inaccurate or incomplete."  (*Id.*)

On May 3, 2017, Moving Defendant mailed a monthly statement that included a notice of amendment of the Cardmember Agreement to Plaintiff at the address listed on Plaintiff's application.  (Wantuch Decl. ¶ 9.)  On September 2, 2017, Moving Defendant mailed another

notice of amendment to Plaintiff at the same address (the "Revised Agreement").  (*Id.*)  This notice informed Plaintiff that effective February 1, 2018, several provisions in the Cardmember Agreement would be changed, including the arbitration provision.  (*Id.* Ex. B ("Revised Agreement"), at 2 (Dkt. No. 70-2).)[4]  According to the Revised Agreement, the updated arbitration provision would require that

> In the event of a dispute between [Plaintiff] and [Moving Defendant] arising out of or relating to th[e] Account or the relationships resulting from th[e] Account or any other dispute between [Plaintiff] and [Moving Defendant] . . . either [Plaintiff] or [Moving Defendant] may choose to resolve the Claim by binding arbitration . . . instead of in court.  Any Claim (except for a claim challenging the validity or enforceability of th[e] arbitration agreement, including the Class Action Waiver) may be resolved by binding arbitration if either side requests it.  THIS MEANS IF EITHER [Plaintiff] OR [Moving Defendant] CHOOSE ARBITRATION, NEITHER PARTY SHALL HAVE THE RIGHT TO LITIGATE SUCH CLAIM IN COURT OR TO HAVE A JURY TRIAL.

(*Id.* at 3.)  The Revised Agreement again set forth that the agreement to arbitrate would be governed by the FAA, and that the arbitration provision would survive "closing of [the] Account; voluntary payment of [the] Account or any part of it; any legal proceedings to collect money [Plaintiff] owe[s]; any bankruptcy by [Plaintiff]; and any sale by [Moving Defendant] of [Plaintiff's] Account."  (*Id.* at 3–4.)  And, as with the Cardmember Agreement, the Revised Agreement stated that Plaintiff "[h]a[d] the [r]ight to [r]eject [a]rbitration for th[e] Account" by sending a "written notice of rejection within 30 days of [Plaintiff's] receipt of the Card after [the] Account [wa]s opened."  (*Id.* at 4.)  According to Moving Defendant, these provisions governed Plaintiff's Account from February 2018 through September 2019.  (Wantuch Decl. ¶ 10.)

---

[4] Given that the page numbers in the Revised Agreement begin at page 11, the Court refers to the ECF-stamped page numbers at the top of each page to avoid confusion.

### 3.  Plaintiffs' Allegations against Moving Defendant

Plaintiff alleges that Moving Defendant furnished inaccurate information related to Plaintiff's Account to Equifax and TransUnion.  (Am. Compl. ¶¶ 16–17.)  Equifax and TransUnion used this information, which allegedly reflected an incorrect account balance and date of last payment, in preparing and issuing credit reports on Plaintiff.  (*Id.*)  These reports were then "disseminated to various persons and credit grantors, both known and unknown."  (*Id.* ¶ 18.)  Plaintiff claims that he notified Equifax and TransUnion of the allegedly inaccurate information via dispute letters sent "on or around" March 5, 2019, and Plaintiff believes that Equifax and TransUnion notified Moving Defendant of the disputes.  (*Id.* ¶¶ 19–20.)  Plaintiff also alleges that upon receiving this information, Moving Defendant "failed to conduct a reasonable investigation," "continued to report false and inaccurate, adverse information on [Plaintiff's] consumer report," and "failed to mark the [A]ccount as disputed despite receiving notice of . . . Plaintiff's dispute."  (*Id.* ¶¶ 21–22.)

Plaintiff claims that as of the date of his Amended Complaint, Moving Defendant continued to furnish "inaccurate and materially misleading" credit data, which Equifax and TransUnion have reported.  (*Id.* ¶¶ 24, 26.)  As such, Plaintiff represents that his credit score has decreased, his creditworthiness had been negatively impacted, and he has suffered "mental and emotional pain, anguish, humiliation, and embarrassment" from credit denials.  (*Id.* ¶¶ 25–26, 99, 112.)

### B.  Procedural Background

The Court recounts only the procedural background that is relevant to Plaintiff, Moving Defendant, and the instant Motion.

Plaintiff filed his original Complaint on September 2, 2019. (Compl.) On November 12, 2019, Moving Defendant and TBF each filed Pre-Motion Letters. (Dkt. Nos. 33–34.) TBF sought to file a motion to dismiss, and Moving Defendant sought to file the instant Motion. (*Id.*) After Plaintiff filed responses to TBF and Moving Defendant, (Dkt. Nos. 39–40), the Court held a Pre-Motion Conference on December 10, 2019, (*see* Dkt. (minute entry for Dec. 10, 2019)). Because of technical difficulties due to a telephonic appearance, Moving Defendant was unable to appear, and subsequently submitted a second pre-motion letter, again seeking leave to file the instant Motion. (Dkt. No. 56.)[5] Plaintiff again opposed Moving Defendant's request, (Dkt. No. 57), and after Moving Defendant submitted an additional letter responding to an argument raised by Plaintiff, as directed by the Court, (Dkt. Nos. 59, 63), the Court set a briefing schedule, (Dkt. No. 64). Additionally, on December 16, 2019, Plaintiff filed an Amended Complaint, as directed by the Court at the December 10 Pre-Motion Conference. (*See* Am. Compl.; Dkt. (minute entry for Dec. 10, 2019).)

Pursuant to the briefing schedule set by the Court, Moving Defendant filed the instant Motion on January 10, 2020. (Not. of Mot.; Wantuch Decl.; Moving Def.'s Mem. of Law in Supp. of Mot. ("Moving Def.'s Mem.") (Dkt. No. 69).) On February 10, 2020, Plaintiff filed his Opposition to the Motion. (Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 71).) On February 24, 2020, Moving Defendant filed its Reply. (Moving Def.'s Reply Mem. of Law in Supp. of Mot. ("Moving Def.'s Reply Mem.") (Dkt. No. 74).)

---

[5] At the Pre-Motion Conference, TBF withdrew its request to file a motion to dismiss. (*See* Dkt. (minute entry for Dec. 10, 2019).)

## II.  Discussion

### A.  Legal Standard

The Federal Arbitration Act ("FAA") provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.[6]  The FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts."  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).  However, "the FAA does not require parties to arbitrate when they have not agreed to do so."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (citation and quotation marks omitted); *see also AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (citations and quotation marks omitted)).

Moving Defendant seeks to compel arbitration and stay this Action.  (Moving Def.'s Mem. 1.)  In the context of this type of motion, courts "appl[y] a standard similar to that applicable for a motion for summary judgment."  *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (citations omitted).  A court must therefore "consider all relevant, admissible evidence submitted by the parties" and "draw all reasonable inferences in favor of the non-moving party."  *Nicosia*, 834 F.3d at 229 (citations and quotation marks omitted).  Under this standard, the Court evaluates "[a]llegations related to the question of whether the parties formed a valid arbitration

---

[6] Section 2 of the FAA applies to arbitration agreements "evidencing a transaction involving [interstate] commerce."  9 U.S.C. § 2.  Here, Plaintiff resides in the State of New York, (Am. Compl. ¶ 4), and Moving Defendant is chartered, incorporated, and has its principal place of business in Delaware, (Wantuch Decl. ¶ 5).  Thus, this requirement is satisfied.  Further, the Cardmember Agreement and Revised Agreement specify that the arbitration of disputes provision "is governed by the [FAA]."  (Cardmember Agreement 4; Revised Agreement 3.)

agreement . . . to determine whether they raise a genuine issue of material fact." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012) (citations omitted).  "If there is a genuinely disputed factual issue whose resolution is essential to the determination of the applicability of an arbitration provision, a trial as to that issue will be necessary . . . ." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (citation omitted); *see also* 9 U.S.C. § 4 ("If the making of the arbitration agreement . . . [is] in issue, the court shall proceed summarily to the trial thereof.").  However, "where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [a court] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Wachovia Bank*, 661 F.3d at 172 (citation and quotation marks omitted); *see also* 9 U.S.C. § 4 ("[U]pon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."); *Ryan v. JPMorgan Chase & Co.*, 924 F. Supp. 2d 559, 561–62 (S.D.N.Y. 2013) ("[A] [c]ourt must grant a motion to compel arbitration if the pleadings, discovery materials before the [c]ourt, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law." (citations omitted)).

B.  Analysis

The Parties' dispute essentially concerns a "[q]uestion[] of arbitrability," which is a "term of art covering 'disputes about whether the parties are bound by a given arbitration clause,' as well as 'disagreements about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'" *Pincaro v. Glassdoor, Inc.*, No. 16-CV-6870, 2017 WL 4046317, at *5 (S.D.N.Y. Sept. 12, 2017) (alterations omitted) (quoting *Howsam v. Dean*

*Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)).[7]  To answer this question, courts in the Second Circuit generally "follow a two-part test," whereby they consider "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement."  *In re Am. Express Fin. Advisors Secs. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011) (citation omitted); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (noting that a court "should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is at issue" (citation and emphasis omitted)).  "If federal statutory claims are alleged, the court must also assess whether Congress intended to exempt such claims from arbitration."  *Clookey v. Citibank, N.A.*, No. 14-CV-1318, 2015 WL 8484514, at *2 (N.D.N.Y. Dec. 9, 2015) (citing *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004)), *reconsideration denied*, 2016 WL 3365438 (N.D.N.Y. June 16, 2016).

Here, Moving Defendant contends that the arbitration provision in the Revised Agreement is valid and enforceable, and that Plaintiff's claims fall within its scope.  (Moving Def.'s Mem. 7–9.)  Plaintiff argues that the provision is "unconscionably broad," and that "no reasonable person would have understood themselves" to be agreeing to such a broad provision.  (Pl.'s Mem. 1–2, 8–25.)  Plaintiff further argues that, in any event, his FCRA claim falls outside of the scope of the Cardmember and Revised Agreements.  (*Id.* at 1–2, 16–21.)

---

[7] Plaintiff devotes several pages in his Memorandum to explaining why arbitrability must be decided by the Court.  (*See* Pl.'s Mem. 4–7.)  However, this point does not appear to be raised or challenged by Moving Defendant.  (*See generally* Moving Def.'s Mem.; Moving Def.'s Reply Mem.)  As such, the Court will determine whether the instant dispute is arbitrable, and will not delegate the question of arbitrability to an arbitrator.

     1.  Validity of the Arbitration Agreement

"Whether one can be bound by an arbitration clause is usually determined by looking at generally accepted principles of contract law." *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004) (collecting cases).  Pursuant to these principles, "a party is bound by the provisions of a contract that he signs, unless he can show special circumstances that would relieve him of such an obligation." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 845 (2d Cir. 1987) (citations omitted), *abrogated on other grounds by Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991); *see also Cap Gemini Ernst & Young U.S. LLC v. Arentowicz*, No. 04-CV-299, 2004 WL 1386145, at *5 (S.D.N.Y. June 22, 2004) ("An individual who signs a contract is presumed to know its contents and assent to them, unless he can show special circumstances, such as duress or coercion, which would justify non-enforcement of the contract." (citation and quotation marks omitted)).  In the context of evaluating whether "special circumstances" sufficient to warrant relief from an arbitration agreement exist, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000) (citations omitted).

"Whether the [P]arties agreed to arbitrate is determined by state contract law." *Kurz v. Chase Manhattan Bank USA, N.A.*, 319 F. Supp. 2d 457, 461 (S.D.N.Y. 2004) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  Here, the Cardmember and Revised Agreements are governed by Delaware law, (Cardmember Agreement 4), under which "a contract is formed if a reasonable person would conclude, based on the objective manifestations of assent and the surrounding circumstances, that the parties intended to be bound to their agreement on all essential terms," *Doe v. Cedars Acad., LLC*, No. 09C-09-136, 2010 WL 5825343, at *3 (Del. Super. Ct. Oct. 27, 2010) (footnote and quotation marks omitted) (quoting

*Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1101 (Del. Ch. 1986)).  The Parties do not dispute that they formed an initial agreement with respect to Plaintiff's Account.  First, Moving Defendant has submitted "uncontroverted evidence show[ing] that [P]laintiff [applied for and] opened a credit card account."  *Biggs v. Midland Credit Mgmt., Inc.*, No. 17-CV-340, 2018 WL 1225539, at *8 (E.D.N.Y. Mar. 9, 2018).  (*See* Wantuch Decl. ¶¶ 6–8.)  Second, Plaintiff does not appear to dispute that the Cardmember Agreement was sent to him.  (*See id.* ¶¶ 7, 9; *see generally* Pl.'s Mem.)  *See Gartly v. Selip & Stylianou LLP*, No. 18-CV-1806, 2018 WL 5777033, at *4 (E.D.N.Y. Nov. 2, 2018) (finding that uncontroverted evidence that the bank sent the plaintiff a credit card agreement and credit card was sufficient to establish that the plaintiff received the agreement).  Third, the Cardmember Agreement contained an opt-out provision, allowing Plaintiff to reject the arbitration provision by sending a written notice of rejection within 30 days of receipt of the Card.  (*See* Cardmember Agreement 5.)  Neither Party claims that Plaintiff mailed an opt-out notice or attempted to cancel the Account at any point, and after receiving the Card, Plaintiff began to use it.  (*See* Wantuch Decl. ¶ 8; Cardmember Agreement 2 ("You accept this Agreement if you do not cancel your Account within 30 days after receiving a Card.  You also accept this Agreement if you or an [a]uthorized [u]ser use the Account.").)  Under Delaware law, this is sufficient to constitute acceptance of the Cardmember Agreement.  *See Grasso v. First USA Bank*, 713 A.2d 304, 309 (Del. Super. Ct. 1998) (finding that language in a credit card agreement instructing that use of the card constituted acceptance of the agreement "establishe[d] that using the card or account mean[t] that the [agreement] ha[d] been accepted"); *Dahlink Fin. Corp. v. Bochniak*, No. CPU4-11-005047, 2012 WL 1415815, at *6 & n.17 (Del. Cmn. Pl. Mar. 13, 2012) (stating that "use of [a] credit card would constitute acceptance of the terms in [an] [a]greement," particularly when it was undisputed that the

defendant received a credit card and made purchases with it (citation, alteration, and quotation

marks omitted)); *see also Anonymous v. JP Morgan Chase & Co.*, No. 05-CV-2442, 2005 WL

2861589, at *4 (S.D.N.Y. Oct. 31, 2005) (explaining that under Delaware law, "[u]sing a credit

card and making payments to the credit provider binds the cardholder to the terms and conditions

of card use" (citation omitted)).

      With respect to the arbitration provision in the Revised Agreement, in Delaware, "a credit

card issuer seeking unilaterally to add an arbitration clause to the agreement must provide notice

and an opt-out provision.  Failure to comply with the terms of the opt-out provision and

continued charges to the account operate as acceptance of the arbitration agreement." *Kurz*, 319

F. Supp. 2d at 465 (citations omitted).  Here, Moving Defendant asserts, and Plaintiff does not

dispute, that Defendant sent the Revised Agreement to Plaintiff, which included an opt-out

provision.  (*See* Wantuch Decl. ¶ 9; Revised Agreement 4 ("You [h]ave the [r]ight to [r]eject

[a]rbitration for this Account.  You may reject the arbitration agreement[,] but only if we receive

from you a written notice of rejection within 30 days of your receipt of the Card after your

Account is opened."); *see generally* Pl.'s Mem.)  Further, Plaintiff does not appear to have

submitted an opt-out request, does not claim that he stopped making charges to the Account after

receiving the Revised Agreement, and does not dispute that his Account remains open.  (*See*

Wantuch Decl. ¶ 8; *see generally* Pl.'s Mem.)  Thus, Plaintiff's conduct demonstrates his

acceptance of the Revised Agreement.  *See Kurz*, 319 F. Supp. 2d at 466 (noting that "continued

charges by authorized users, coupled with [the] plaintiff's failure to submit to [the] defendant the

required written objection [to an arbitration amendment], evince[d] [the] plaintiff's consent to

the arbitration amendment" (footnote omitted)).

However, Plaintiff argues that "special circumstances," *Genesco*, 815 F.2d at 845, preclude enforcement of the arbitration provision, taking issue with the fact that the Revised Agreement allows for arbitration not only of a dispute "arising under or relating to th[e] Account or the relationships resulting from th[e] Account" but also "any other dispute between [Plaintiff] or [Moving Defendant]."  (Pl.'s Mem. 13; *see also* Revised Agreement 3.)  Plaintiff seeks to have the Court invalidate the arbitration provision in the Revised Agreement because, according to Plaintiff, no reasonable person would have agreed to "arbitrate all possible disputes with [Moving Defendant], . . . 'forever now and in the future,' regardless of any relation to the underlying agreement and temporally unmoored from it."  (Pl.'s Mem. 8.)  Plaintiff also argues that enforcing the arbitration clause as written would be unconscionable because it would allow Moving Defendant to compel arbitration over a "potentially limitless number of claims."  (*Id.* at 21–22.)

To the contrary, Moving Defendant does not argue that the provision covering "any other dispute between [Plaintiff] or [Moving Defendant]" applies to this Action.  (Moving Def.'s Reply Mem. 1.)  Instead, Moving Defendant seeks to compel arbitration under the provision allowing for arbitration of a dispute "arising out of or relating to th[e] Account."  (*Id.* ("[T]he Motion is based upon the . . . fact that Plaintiff's claims . . . 'arise[] under or relate[] to this Account.'" (alterations omitted)); *see also* Revised Agreement 3.)  Therefore, because the provision related to "any other dispute between [Plaintiff] or [Moving Defendant]," (*id.*), is not at issue here, the Court need not further address its enforceability, and will not go so far as to invalidate the entire arbitration clause on the basis of this phrase.  *See Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 & n.6 (2d Cir. 2015) (noting that the court would not consider the first portion of an arbitration agreement, which applied to disputes "arising out of, or in relation

to th[e] document," because the defendants seeking to enforce the arbitration provision argued

that the plaintiff's claims arose out of the second portion, which applied to disputes "arising out

of . . . [the] [e]mployee's employment"); *see also Cordoba v. DirecTV, LLC*, 801 F. App'x 723,

725–26 (11th Cir. 2020) (declining to address "the more general question of whether the relevant

arbitration provision [wa]s in fact enforceable as to 'all claims and disputes,'" because the claim

at issue fell within the purview of the arbitration agreement, as it "ar[ose] out of or relat[ed] to

any aspect of the relationship between the parties" (emphasis and some quotation marks

omitted)); *Stinson v. Best Buy Co., Inc.*, No. 18-CV-295, 2018 WL 3850739, at *10 (D. Minn.

June 26, 2018) (stating that an arbitration provision need not "be invalidated in its entirety

simply because it *could* be read too broadly" (emphasis added)), *adopted by* 2018 WL 3848443

(D. Minn. Aug. 13, 2018).

Plaintiff offers no argument to suggest that the portion of the provision under which

Defendant seeks to enforce arbitration—allowing for arbitration of claims "arising under or

related to the Account"—is unreasonable or unconscionable, instead noting that such a provision

is "limited in scope." (*See* Pl.'s Mem. 13 ("[T]he arbitration clause that Plaintiff originally

executed when he first signed up for the . . . [C]ard *was* limited in scope[, as it stated that either

party could choose to arbitrate] a dispute between [Plaintiff] and [Moving Defendant] arising

under or relating to this [A]ccount." (emphasis in original) (record citation and second emphasis

omitted).) Indeed, a dispute related to or arising under the Account is "precisely what one would

reasonably expect would fall under the terms of the arbitration clause." *Damato v. Time Warner

Cable, Inc.*, No. 13-CV-994, 2013 WL 3968765, at *7 (E.D.N.Y. July 31, 2013). Further,

Plaintiff does not argue that a provision allowing for arbitration of a matter that arises under or

relates to the Account would be "unfairly structured," or "so one-sided as to be oppressive," as is

required to demonstrate unconscionability under Delaware law.  *See JP Morgan Chase & Co.*, 2005 WL 2861589, at *5 (quotation marks omitted) (quoting *Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 912 (Del. 1989)); *see also Standard Gen. L.P. v. Charney*, No. 11287-CB, 2017 WL 6498063, at *17 (Del. Ch. Dec. 19, 2017) ("In order to find an agreement unconscionable, Delaware courts must find what amounts to both substantive and procedural unconscionability—that the party with superior bargaining power used it to take unfair advantage of his weaker counterpart and that its terms are so one-sided as to be oppressive." (footnote, alteration, and quotation marks omitted)), *aff'd*, 195 A.3d 16 (Del. 2018).[8]  Instead, Plaintiff's unconscionability argument hinges on a portion of the arbitration clause that Moving Defendant does not seek to enforce, and is therefore irrelevant to this Motion.  *See Chen-Oster v. Goldman, Sachs & Co.*, —F. Supp. 3d— , 2020 WL 1467182, at *22 (S.D.N.Y. Mar. 26, 2020) (explaining that the plaintiffs' argument that an arbitration provision was unconscionably broad was "irrelevant" because the case did not present a situation that would fall under the purportedly unconscionable provision).  Moreover, even if the Court were to find that the portion of the arbitration clause applying to "any other dispute" was overly broad or unconscionable, the Court would still find that Plaintiff's FCRA claims plainly fall within the scope of the Cardmember and Revised Agreements, as explained below.  Thus, "[P]laintiff[] ha[s] not demonstrated that the

---

[8] Plaintiff does not appear to argue that the Revised Agreement is procedurally unconscionable.  (*See generally* Pl.'s Mem.)  In any event, such an argument would likely not succeed, as Plaintiff had a period of 30 days to opt-out of the arbitration provision.  *See Valle v. ATM Nat'l, LLC*, No. 14-CV-7993, 2015 WL 413449, at *6 (S.D.N.Y. Jan. 30, 2015) (finding that a provision was not procedurally unconscionable when the plaintiffs had 45 days to opt out of it); *cf. Fort Howard Cup Corp. v. Quality Kitchen Corp.*, No. 89-C-DE-34, 1992 WL 207276, at *6 (Del. Super. Ct. Aug. 17, 1992) (concluding that when the parties to a lease agreement had a "clear option" to terminate it "upon [30] days written notice," it was "difficult to imagine circumstances which would render the contract unconscionable" (citations omitted)).

arbitration clause would ensnare disputes beyond reasonable expectations," because "the instant dispute is precisely what one would reasonably expect would fall under the terms of the arbitration clause." *Damato*, 2013 WL 3968765, at *7.[9]

### 2.  Scope of the Arbitration Agreement

Plaintiff argues that even if the Court does not invalidate the arbitration clause, his claims fall outside of the scope of the Cardmember and Revised Agreements because "the last thing on the reasonable consumer's mind is the question of enforcing rights to accurate credit reporting under the FCRA, especially when . . . Plaintiff[] is unsophisticated."  (Pl.'s Mem. 16 (footnote omitted); *see also id.* at 20–21 ("[T]he question of whether Congress 'has evidenced an intention to preclude a waiver of judicial remedies' under the FCRA is permanently foreclosed by the fact that Plaintiff never agreed to arbitrate these claims in the first instance.").)  Plaintiff also argues that "[a]ny rights to accurate credit reporting are the sole reserve of the [FCRA] itself," and that "a furnisher's duty to report information accurately to the credit bureaus . . . [is] nowhere to be found in the contract itself."  (*Id.* at 18–19 (citation omitted).)

"To determine if a dispute falls within the scope of an arbitration agreement, a court should classify the particular clause as either broad or narrow."  *Boss Worldwide LLC v. Crabill*, No. 19-CV-2363, 2020 WL 1243805, at *3 (S.D.N.Y. Mar. 16, 2020) (quotation marks omitted) (quoting *JLM Indus.*, 387 F.3d at 172).  When "the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim

---

[9] Plaintiff also takes issue with the survivability clause, explaining that the clause "means that any claim could be subject to arbitration ad infinitum, years after Plaintiff had even closed the account" and the assignment clause, which would "subject any claim to arbitration that arose from debt collectors who had been sold the account long after it had been closed."  (Pl.'s Mem. 14 & n.4 (record citations and italics omitted).)  However, Moving Defendant also does not seek to compel arbitration under these provisions, and thus, the Court does not further address them herein.

alleged implicates issues of contract construction or the parties' rights and obligations under it."
*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001)
(citation and quotation marks omitted).  "Indeed, if the arbitration clause is broad, it is
presumptively applicable to disputes involving matters going beyond the interpretation or
enforcement of particular provisions of the contract which contains the arbitration clause." *Boss
Worldwide*, 2020 WL 1243805, at *3 (quotation marks omitted) (quoting *JLM Indus.*, 387 F.3d
at 172).

Here, the applicable provision states that Moving Defendant and Plaintiff may choose to
arbitrate disputes "arising out of or relating to this Account."  (Revised Agreement 3.)  This is
the "paradigm of a broad clause," *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20
(2d Cir. 1995) (citation omitted) (stating that a "broad clause" is one which purports to refer all
disputes arising out of or relating to an agreement to arbitration), and Plaintiff's FCRA claims
certainly fall within its scope.  Plaintiff alleges that Moving Defendant furnished inaccurate
information about his Account to credit bureaus and failed to conduct a reasonable investigation
after Plaintiff notified the bureaus that the information was incorrect.  (*See* Am. Compl. ¶¶ 16–
26, 91–113.)  Although Plaintiff argues that rights to accurate credit reporting are the "sole
reserve of the statute," (Pl.'s Mem. 18), it is "crystal clear" that such a claim is "*related* to
[Plaintiff's] . . . credit [A]ccount" and thus "falls within the scope of the arbitration agreement,"
*Khaliquzzaman v. Equifax Info. Servs. LLC*, No. 17-CV-1450, 2018 WL 3825887, at *4
(E.D.N.Y. Aug. 10, 2018) (emphasis added) (citations omitted).  Indeed, numerous district courts
within the Second Circuit have found that similar FCRA claims against credit card issuers,
lessors, and other entities fall within the scope of arbitration provisions in similar types of
agreements.  *See id.* (finding that a claim related to the reporting of credit information by a credit

card issuer fell within the scope of an arbitration agreement with the card issuer that covered

disputes, claims, and controversies that arose out of or were related to the credit card account);

*Clookey*, 2015 WL 8484514, at *2 (agreeing that a credit card agreement's "broad arbitration

clause undoubtedly capture[d] [a] . . . dispute" over pulling credit reports by the credit card

issuer (record citation omitted)); *Gaul v. Chrysler Fin. Servs. Ams. LLC*, No. 13-CV-433, 2013

WL 3828549, at *2 (N.D.N.Y. July 23, 2013) (finding that a broad arbitration clause in a vehicle

lease agreement covered the plaintiff's claims of inaccurate credit reporting by the defendant car

lessor), *aff'd*, 657 F. App'x 16 (2d Cir. 2016).

Further, as explained by Moving Defendant, the Cardmember Agreement explicitly

speaks to credit reporting, noting that Moving Defendant "may report the status and payment

history of [the] Account to credit reporting agencies and other creditors," and provides an avenue

for reporting if inaccurate or incomplete information was provided.  (Cardmember Agreement 3;

*see also* Moving Def.'s Reply Mem. 1.)  Thus, although Moving Defendant's obligation to

provide accurate credit reporting is not necessarily "*compelled* by the Agreement," (Pl.'s Mem.

20 (emphasis added)), reporting of credit information is undoubtedly related to the Cardmember

Agreement and Plaintiff's Account, and thus could reasonably be expected to fall under the

arbitration provision covering disputes "arising out of or relating to th[e] Account," (Revised

Agreement 3).  *See Wexler v. AT & T Corp.*, 211 F. Supp. 3d 500, 504 (E.D.N.Y. 2016) (noting

that in agreeing to arbitrate, a reasonable person would "express[], at most, an intent to agree to

arbitrate disputes connected in some way to the [overarching] agreement").

Many of the cases Plaintiff cites are inapposite, because they involved claims that bore no

relation to the relevant agreements, and only one of these cases is from a district court within the

Second Circuit.  In *Wexler*, the plaintiff's cell phone service agreement included a broad

arbitration clause that applied to the defendant and its affiliates and required arbitration of "all disputes and claims between [them]." *Id.* at 501. The plaintiff sued the defendant for violations of the Telephone Consumer Protection Act ("TCPA") due to unsolicited text message advertisements for television and internet service that the plaintiff received from one of the defendant's subsidiaries after the expiration of her cell phone contract. *Id.* at 502. The court declined to compel arbitration of the plaintiff's claims, finding both that the arbitration clause was "unlimited in scope" and that the plaintiff's claim was wholly unrelated to her cell phone service. *Id.* at 504–05 ("[N]o reasonable person would think that checking a box accepting the 'terms and conditions' necessary to obtain cell phone service would obligate them to arbitrate literally every possible dispute he or she might have with the service provider, let alone all of [its] affiliates . . . —including those who provide services unrelated to cell phone coverage."). Conversely, Plaintiff's claims about Account information reported by Moving Defendant directly relate to his Account and Cardmember Agreement.

The other cases cited by Plaintiff where arbitration clauses were deemed overly broad are also distinguishable, because the relevant claims were unrelated to the agreements that contained the arbitration clauses. *See Smith v. Steinkamp*, 318 F.3d 775, 777–78 (7th Cir. 2003) (determining that arbitration provisions in agreements related to certain loans were inapplicable to claims regarding different loans, for which no arbitration agreements had been executed); *Hearn v. Comcast Cable Commc'ns, LLC*, 415 F. Supp. 3d 1155, 1164–66 (N.D. Ga. 2019) (determining that the plaintiff's FCRA claim related to the defendant's "hard pull" of his consumer report when the plaintiff called to inquire about the defendant's services was "substantively and temporally unmoored" from the parties' previously-terminated service agreement), *filing appeal*, No. 19-14455 (11th Cir. 2019); *In re Jiffy Lube Int'l, Inc., Text Spam*

*Litig.*, 847 F. Supp. 2d 1253, 1262–63 (S.D. Cal. 2012) (finding that the defendant could not compel arbitration with the plaintiff under an agreement related to an earlier oil change when the plaintiff alleged that text messages he received about *future* services violated the TCPA).[10]

Indeed, district courts across the country have distinguished these cases from others where a party's claims clearly arose from or related to the agreement at issue. *See Chen-Oster*, 2020 WL 1467182, at *22 (finding that the plaintiffs' arguments that any conceivable tort claim could be covered by a broad arbitration clause were "irrelevant" because the claims at issue "f[e]ll squarely within the [arbitration] clause"); *Damato*, 2013 WL 3968765, at *7 (explaining that although federal and state courts in California have recognized that arbitration clauses can be unconscionably broad when their "scope exceeds reasonable expectations," the plaintiff's dispute fell "plainly within the scope of [its] [s]ubscriber [a]greement"); *see also Cordoba*, 801 F. App'x at 725–26 ("Without addressing the more general question of whether the relevant arbitration provision is in fact enforceable as to 'all claims and disputes' . . . , we find—based on the limited facts of this matter—[that the] claim [at issue] indeed falls within its purview."); *Brown v. Firstsource Advantage, LLC*, No. 17-CV-5760, 2019 WL 568935, at *4 (E.D. Pa. Feb. 12, 2019) (distinguishing *Jiffy Lube* and *Wexler* because the plaintiff's claim "ar[o]se[] from conduct related to the credit card account he opened when he entered into his [c]ardmember [a]greement"); *Stinson*, 2018 WL 3850739, at *10 ("*Wexler* supports the idea that an arbitration provision cannot be applied to require arbitration of claims wholly unrelated to the contract itself, but not that a broadly worded arbitration clause is invalid in all applications."); *Coppock v.*

---

[10] Plaintiff also asserts that *Jiffy Lube* and *Hearn* foreclose the argument that Plaintiff's FCRA claims arose out of the Agreement because without the Agreement, Plaintiff would not have had such a claim. (Pl.'s Mem. 19–20.)  However, Moving Defendant does not make this argument, and the Court's holding is not based on such a "but-for" finding.  Therefore, the Court does not further address this point.

*Citigroup, Inc.*, No. 11-CV-1984, 2013 WL 1192632, at *5 (W.D. Wash. Mar. 22, 2013) (distinguishing *Jiffy Lube* because the phone calls at issue were "clearly related" to the plaintiff's credit card account, and thus the agreement governing the account (citation omitted)); *Cayanan v. Citi Holdings, Inc.*, 928 F. Supp. 2d 1182, 1208 (S.D. Cal. 2013) (distinguishing *Jiffy Lube* because the defendant's alleged conduct was "directly related to [the] [p]laintiffs' accounts and the contracts that govern them").  Further distinguishing this Action from the cases cited by Plaintiff is the fact that while the Revised Agreement does allow for arbitration of "any other dispute," it also includes a more limited provision regarding disputes "arising out of or relating to th[e] Account," which is the relevant clause here.  (Revised Agreement 3.)  The arbitration provisions in many of the cases cited by Plaintiff did not include a similar, more limited phrase. *Cf. Hearn*, 415 F. Supp. 3d at 1158 (defining "[d]ispute" as "any claim or controversy related to Comcast" (record citation omitted)); *Wexler*, 211 F. Supp. 3d at 501 ("AT & T and you agree to arbitrate all disputes and claims between us." (record citation omitted)); *Jiffy Lube*, 847 F. Supp. 2d at 1262 ("Jiffy Lube[] and you agree that any and all disputes, controversies[,] or claims between Jiffy Lube[] and you . . . . will be resolved by mandatory arbitration . . . .").

Thus, Plaintiff's argument that the "potential universe of claims" under the Revised Agreement "is limitless" and could include "claims for unlawful conversion and fraudulent securities offerings, wrongful death suits against the creditor, and personal injury torts involving an accident with an employee of the creditor," (Pl.'s Mem. 22), is unavailing.  This "case does not present a dispute of the nature theorized by Plaintiff[]," *Chen-Oster*, 2020 WL 1467182, at *22, and any such situation is merely hypothetical, *see Damato*, 2013 WL 3968765, at *7 (dismissing the plaintiff's argument that an overly broad arbitration clause in the plaintiff's internet service agreement could sweep in a vehicle accident with the servicer's truck when the

"instant dispute" was "plainly within the scope of the [s]ubscriber [a]greement").  Indeed, Plaintiff's claims regarding the reporting of information about his Account by Moving Defendant are "precisely what one would reasonably expect [to] fall under the terms of the arbitration clause." *Id.*

Finally, to the extent Plaintiff seeks to argue that his claims under the FCRA have been precluded from arbitration by Congress—and it is not clear that he does—Plaintiff has failed to meet his burden.  "The federal policy favoring arbitration extends to the enforcement of agreements to arbitrate claims founded on statutory rights." *Bynum v. Maplebear Inc.*, No. 15-CV-6263, 2016 WL 5373643, at *6 (E.D.N.Y. Sept. 19, 2016) (citing *Gilmer*, 500 U.S. at 26; *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987)).  "The enforceability mandate of the FAA may be overridden by a showing of contrary congressional command," and "a party opposing arbitration bears the burden of demonstrating that Congress intended to preclude a waiver of judicial remedies for the particular statutory rights at issue." *Id.* at *7 (citations omitted).  With respect to the FCRA, district courts within the Second Circuit regularly compel arbitration of such claims. *See Khaliquzzaman*, 2018 WL 3825887, at *4 (compelling FCRA claims to arbitration); *Clookey*, 2015 WL 8484514, at *2 ("[C]ourts have repeatedly held that allegations of FCRA violations may proceed to arbitration." (collecting cases)); *Gaul*, 2013 WL 3828549, at *2 (compelling FCRA claims to arbitration); *DeGraziano v. Verizon Commc'ns, Inc.*, 325 F. Supp. 2d 238, 245 (E.D.N.Y. July 22, 2004) (rejecting the plaintiff's argument that arbitration of alleged FCRA violations was improper, due to the "well-settled" tenet that "statutory rights may be arbitrated so long as the prospective litigant effectively may vindicate his or her statutory cause of action in the arbitral forum" (quotation marks omitted) (quoting

*Green Tree Fin. Corp.*, 531 U.S. at 90)).  Plaintiff has pointed to nothing to suggest that arbitration of FCRA claims has been precluded by Congress.

As such, the Court finds that the arbitration provision, as applied by Moving Defendant in this case, is enforceable, and that Plaintiff's claims fall within its scope.  The Court therefore grants the Motion and stays this Action pending the arbitration, as requested by Moving Defendant, (Moving Def.'s Mem. 9–10).  *See* 9 U.S.C. § 3 ("[T]he court . . . upon being satisfied that the issue . . . is referable to arbitration under . . . an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .").

### III.  Conclusion

For the foregoing reasons, the Court grants Moving Defendant's Motion To Compel Arbitration.  The case, as it pertains to Moving Defendant, is stayed pending arbitration.  The Clerk of Court is respectfully directed to terminate the pending Motion.  (*See* Dkt. No. 68.)

SO ORDERED.

DATED:      June 22, 2020
            White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

24